**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-0388 (RC)** |
| **v.** | : | |
| | : | |
| **VIC WILLIAMS,** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Vic Williams ("Williams") to 14 days in custody followed by three years' probation, 60 hours of community service, and $500 in restitution.[1]

**I.      Introduction**

The defendant, Vic Williams, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Williams pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a sentence of 14 days in

---

[1] Cognizant of remarks this Court has made in other cases indicating that the Court may be unlikely to impose imprisonment for non-violent offenders during the ongoing COVID pandemic, the government nonetheless recommends 14 days of incarceration because that sentence would satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

custody is appropriate in this case because Williams: (1) saw smoke and violence on Capitol grounds, but he continued to march toward, and ultimately enter, the Capitol building, where he remained for about a minute and a half; (2) posted to social media about the events leading up to the riot and his participation in the riot itself, including that on January 5, 2021, he saw a "crowd that looks like they just rappelled from a helicopter. . . [who] did not come for violence but if pushed violence will ensure and the violent will take it by force."  Also, Williams posted about returning to the Capitol on January 7, 2021, including posting, "See you Patriots tomorrow at the Capitol;" and (3) seemingly attempted to conceal his involvement in the riot by lying to the Federal Bureau of Investigation (FBI) in a February 2021 interview and deleting Facebook posts.

The Court must also consider that Williams' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt for hours the Congressional certification vote. Here, Williams' participation in a riot that actually succeeded in halting that certification—combined with Williams' knowledge of violence prior to entering Capitol grounds, postings to social media, and false statements to the FBI—demonstrate that probation alone is not warranted in this case.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 32 (Statement of Offense) ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent –

contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop, the Court should evaluate Williams' conduct and behavior on January 6.

*Vic Williams' Role in the January 6, 2021 Attack on the Capitol*

According to a February 2021 interview of Williams by FBI agents, Williams flew to Washington, D.C on January 4, 2021, met a friend in the District, and returned home on January 8, 2021. On January 6, 2021, he attended President Trump's "Stop the Steal" rally on the National Mall. Toward the end of President Trump's speech, Williams and a friend[2] left the rally and marched with a crowd to the Capitol.

On their way to the Capitol, Williams' friend opened a video from a third-party source that showed smoke and violence at the Capitol. In a Facebook live posting that Williams recorded after the event, he described the video as showing "smoke flying everywhere" and "they were fighting 'em. They were putting smoke on 'em. Everything. Trying to get them outta there." In the same Facebook live posting, Williams stated that he could hear explosions and see smoke as he was approaching the Capitol. Williams also recalled that he had to climb up a wall and scaffolding to get to the building. Supporting his own statement that he climbed scaffolding to get to the building, Williams posted the following photograph to Facebook with the caption, "On the steps."

---

[2] Williams' friend is known to the FBI but does not appear to have entered the U.S. Capitol building on January 6 and has not been arrested.



Capitol surveillance footage shows that Williams entered the Capitol building at approximately 3:12 p.m. Williams walked into the building through the Senate Wing Door on the West side of the Capitol. He remained in the entranceway near the Senate Wing Door until walking out the same door about a minute and a half later.  A still from Capitol surveillance footage showing Williams entering through the Senate Wing Door is below. Williams is circled in red.



4

*Williams' Social Media Posts*

Prior to January 6, 2021, Williams posted to social media about his planned trip to Washington, D.C., and on January 6, 2021, and after, Williams posted to social media about his participation in the Capitol riot. On December 24, 2020, in a Facebook post, Williams explained how and why he decided to travel to Washington, D.C.:

> A friend text and said, hey you going to the event at the Capital [*sic*] on January 6[th]? Since hearing about it I so bad wanted to go. I passionately believe if we are not allowed answers to this apparent fraud then our democracy will cease to exist and I sense people do not get the full consequences of that. I thought every room will be booked, Antifa and other America terrorist groups will be there, 4 days out of my time I could be working, excuse, excuse, excuse. . . . Don't be a talker nor a coward get your butt up and go support what you believe in, be a part of this. Storming the steps of the Nation's Capitol, it will be the second time I stood in front of the capitol during an election season but never under such distress as the country is now. . . . Many sacrifices were made since 1776 for me I will make a small one to join the voices and stand for democracy.

Along with this caption, Williams posted the following graphic:



Several days later, on January 3, 2021, Williams posted to Facebook, "don't be fooled that you are not at war and take lightly just what is at stake. I am going to DC tomorrow to voice my

concern. If we do not win this battle **we may need more than our voice** to keep our freedom."

On January 5, 2021, Williams posted:

> The pulse right now from the little I have seen thus far in DC . . . There are the MAGA hats with the Trump 2020 shirts and they are friendly and excited but then there is another type I want to talk about. There is a **crowd that looks like they just rappelled from a helicopter** after being in the field for 20 days. They don't appear excited nor happy. **They are pissed.** We are all pissed but they are a different level of mad. They are here to protest and protect as they have been trained to do, protect freedom. The ironic part of it is many have served in the military, they were trained to kill and told they were defending the freedom of America. The irony is now **they realize our freedom is being attacked and they are ready to fight** as they were trained by the same government now trying to steal their freedom. . . . They are at ease and content to have a peaceful rally but God help anyone who gets between them and their freedom. . . . So what you see on the fake news remember **they did not come for violence but if pushed violence will ensue and the violent will take it by force**.

On January 6, 2021, Williams sent private Facebook messages, stating, "I'm inside," "Inside the Capitol," and "I got in the Capitol."  The FBI also received from a tipster the screenshot below, a posting by Williams of what appears to be the Senate Wing Door alongside the caption, "I said I wasn't going in but then I couldn't help myself."[3]



---

[3] This post was sent to the FBI by a tipster. It was not recovered in the Facebook search warrant return.

Williams attempted to legitimize his and others' participation in the riot in a lengthy post from January 6, 2021.[4]  In the post, Williams characterized the violent riot as "Patriots voic[ing] their concerns and anger."  He also minimized the nearly $1.5 million in damage to the Capitol building caused by the rioters, stating, the "Capitol had a few extremist do about $500 damage to it [*sic*]."  He ended his post by stating. "WE are America," alongside a selfie of himself outside the U.S. Capitol building on January 6. A still of the final sentence of this post and Williams' selfie is below.



On January 6, 2021, after the riot, Williams recorded and posted a Facebook live video.[5] In the 17-minute video, Williams describes his participation in the riot, including attending the rally on the National Mall before marching to the Capitol. He said that on his way to the Capitol,

---

[4] This post was sent to the FBI by a tipster. It was not recovered in the Facebook search warrant return.

[5] This video was sent to the FBI by a tipster. It was not recovered in the Facebook search warrant return.

the friend he was with received a report of smoke and violence at the Capitol. Williams describes the video as showing "Smoke flying everywhere. . . . They were fighting 'em. They were putting smoke on 'em. Everything. Trying to get them out of there." Also, as Williams describes approaching the Capitol, he said he kept "hearing explosions and more smoke." He later confirmed that there was smoke at the Capitol by stating that, as he was approaching the Capitol, he had to don his mask due to the smoke. Once they got to the Capitol, Williams said they had to climb a wall and scaffolding to continue forward. Specifically, Williams said, "Had to climb up a wall to get to the next step" and "when we got to the scaffolding, got up to it, had to go over it." A screenshot from the Facebook live post is below.[6]



_____

[6] Because the government obtained this video from a tipster and it appears the video was subsequently deleted from Williams' Facebook account, the government does not have a copy of this video with clearer text.

In the same video, after Williams discussed the smoke, hearing explosions, and climbing over a wall and scaffolding to get to the building, he stated that law enforcement officers were allowing rioters to enter the building. He characterized his interactions with law enforcement officers as a "tour of the Capitol" and said that after his entry into the building "riot police [were] standing around." Law enforcement officers were not actively preventing rioters from entering the building, but the officers were vastly outnumbered and, in many cases, attempting to avoid violent confrontations with rioters. And, before entering the Capitol building, Williams encountered many signs that the rioters on Capitol grounds and who entered the building were trespassing. For instance, Williams mentioned that he could hear smoke and explosions when approaching the building, and he had to climb a wall and scaffolding to get to the entrance. In addition, Williams stated in the 17-minute Facebook live post that he saw a broken-down door and broken glass. Also, at the time Williams entered the building, the windows on either side of the Senate Wing Door were broken, and people were entering and exiting through the windows. Finally, immediately upon entering, rioters encountered a large piece of wood furniture that had been destroyed. Thus, while law enforcement officers were not directly confronting rioters, there were many signs leading up to Williams' entry into the building that entry was unlawful.

On January 6 and 7, 2021, Williams again posted to Facebook, stating he intended to return to the Capitol and encouraged others to return to the Capitol, as well. On January 6, 2021, at approximately 10:49 p.m. ET, he posted, "See you Patriots tomorrow at the Capitol," and on January 7, 2021, at approximately 12:08 a.m., Williams posted, "Go stand at the Capitol and be counted."

Notably, as mentioned in footnotes 3-5, several of the social media posts copied above were provided to the FBI by tipsters but were not in the Facebook search warrant return of

Williams' Facebook account.  The reason for this is not clear, but the government's investigation has shown that Williams had learned of the FBI's investigation by mid-January 2021. Specifically, on January 17, 2021, in a private Facebook messenger chat, Williams was asked by a third party, "Did you get a visit from the FBI?" Williams responds, "No Sir. My friend did[.] He says I'm next." On March 25, 2021, the FBI sent Facebook a preservation letter and, on April 20, 2021, served a search warrant. Some of the social media posts were not found in the Facebook search warrant return. Thus, the government believes Williams deleted these posts sometime between when the posts were uploaded and March 25, 2021.

*Vic Williams' Interviews*

Williams voluntarily agreed to two interviews with the FBI, one on February 12, 2021, and the second at the time of his arrest on May 20, 2021. During the February 2021 interview, Williams made statements that were later contradicted by the investigation.  Williams falsely stated he did not cross any fences or barriers to enter the Capitol.  He also falsely stated that he did not enter the U.S. Capitol building on January 6, 2021.

The FBI interviewed Williams for a second time immediately after his arrest. During this second interview, Williams admitted that he entered the Capitol building.

*The Charges and Plea Agreement*

On May 10, 2021, Williams was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On May 20, 2021, he was arrested at his home in Texas. On June 4, 2021, Williams was charged by four-count Information with violations of 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 28, 2021, he pleaded guilty to Count Four of the Information, charging him with a

violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Picketing, or Demonstrating in a Capitol Building. By plea agreement, Williams agreed to pay $500 in restitution.[7]

### III.    Statutory Penalties

Williams now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). Williams faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, some of the Section 3553(a) factors weigh in favor of incarceration while others support a lesser sentence.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the

---

[7] The plea agreement mistakenly states that the defendant will pay restitution to the U.S. Department of the Treasury.  The Architect of the Capitol is the correct payee.

only times in our history when the building was physically occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, the Court must assess a defendant's individual conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Williams personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Williams' part is therefore not a mitigating factor in misdemeanor cases, nor

does it meaningfully distinguish Williams from most other misdemeanor defendants.  Williams'
lack of violence and property destruction is the reason he was charged only with, and permitted to
plead guilty to, only a misdemeanor rather than a felony.

Although Williams did not directly engage in any violence, he was aware of the potential
for violence even before January 6, 2021, and concretely aware that violence was occurring prior
to entering Capitol grounds on January 6, 2021.  Williams posted to social media about traveling
to Washington, D.C. and, during and after the riot, about his participation in the attack. Several of
his posts note a potential for violence, either on January 6 or after. For instance, on January 3,
2021, Williams posted to Facebook, "If we do not win this battle we may need more than our voice
to keep our freedom." On January 5, 2021, Williams posted about "a crowd that looks like they
just rappelled from a helicopter." He said the crowd was "pissed" and "ready to fight." Williams
also continued to march toward the Capitol even after learning of violence on the grounds, and he
entered the Capitol building after seeing smoke and hearing explosions. In addition, once Williams
reached the Capitol, he indicated he climbed over a barrier and scaffolding to reach the Capitol
building.

On January 6, 2021, Williams made light of his unlawful entry into the Capitol building by
posting, "I said I wasn't going in but then I couldn't help myself," alongside a photograph of what
appears to be the Senate Wing Door, where Williams entered the building. On January 6, 2021,
Williams also posted an over 17-minute long video of himself discussing the day's events. In the
video, Williams talks about a friend he was with receiving a video showing smoke and violence.
Yet Williams continues to march toward the Capitol building. After the riot, Williams again posted
to social media, notifying his followers that he was returning to the Capitol that day and
encouraging others to join him.

Finally, Williams attempted to conceal his involvement in the riot by lying to FBI agents in a February 2021 interview and apparently deleting social media posts about his participation in the January 6, 2021, riot.  In the February 2021 interview, Williams stated that he did not enter the Capitol building on January 6, 2021. Williams only corrected this false statement during his second interview with the FBI on May 20, 2021, immediately after his arrest. In addition, it appears that Williams deleted some social media posts about his participation in the January 6, 2021, riot.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Vic Williams' criminal history consists of one traffic infraction. ECF No. 41 ¶ 27. Williams was employed as a District Manager for a drilling company from July 2019 to October 2020. *Id*. ¶ 53. Beginning in June 2021, he began employment as a Senior Drilling Advisor with a company in Houston, Texas. *Id*. ¶ 52. Williams has been compliant with his conditions of pre-trial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Williams' willingness to continue toward the Capitol after watching a video showing smoke and violence, his social media posts before, during, and after the riot, and his false statements to the FBI during his February 2021 interview demonstrate the need for specific deterrence for this defendant.

Also, as of the date of this filing, Williams has expressed little remorse. On the one hand, the government acknowledges that Williams accepted responsibility early by entering into this plea agreement and has expressed remorse through his counsel and in his discussion with Probation during the presentence investigation. On the other hand, on social media, the day after the Capitol riot, Williams twice posted that he was returning to the Capitol. In addition, he lied to FBI agents

by stating that he did not enter the Capitol building on January 6, 2021. This lack of remorse in the short aftermath of the riot underscores the need for specific deterrence in this case.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[9] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[10] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is

---

[9] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities. *See, e.g.*, *United States v. Hatley*, 1:21-cr-98 (TFH), Tr. 12/16/21 at 3 ("it's a good guideline for the Court to understand the variety of sentences that have been given [referencing the government's sentencing chart]") (statement of Judge Hogan).

[10] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097 (PFF); *United States v. Dona Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365 (DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365 (DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing).

Williams has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with

significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may wish to consider the sentences imposed on Glenn Croy, Dona Bissey, John Lolos, and Stephanie Miller for reference.  Like Williams, each of these defendants was charged with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G), and each pled guilty to violating 40 U.S.C. § 5104(e)(2)(G).  Additional details about these cases are outlined below.

   a.  Glenn Croy, 21-cr-162-BAH, entered the Capitol after witnessing law enforcement attempt to keep rioters at bay for over an hour. Also, Croy supported antagonistic actions against law enforcement officers. In addition, Croy later bragged about and defended his actions to friends, similar to Williams' social media posts. Croy also entered the U.S. Capitol twice on January 6 and seems to have subsequently lied about this fact to the FBI. Although William did not enter the building twice, he also lied to the FBI about his conduct on January 6. The Court sentenced Croy to 14 days in a community correctional facility followed by 90 days of home confinement and 36 months of probation.

   b.  Dona Bissey, 21-cr-165-TSC, entered the U.S. Capitol building from the Eastern Front and remained in the building for approximately 10 minutes. After the riot, Bissey, like

Williams, posted about her experience on social media, including a photograph of herself and other with the caption, "Inside the Capitol Building;" a screenshot of a Twitter post that stated, "This is the First time the U.S. Capitol has been breached since it was attacked by the British in 1814;" and a photograph of herself and others with the caption, "It was a day I'll remember forever. I'm proud that I was a part of it! No Shame. BTW turn off the #FakeNews." Bissey also posted a photograph of protestors climbing the scaffolding and a photograph of a protestor holding a stolen and broken sign that read "Speaker of the House." The Court sentenced Bissey to 14 days incarceration.

c.  John Lolos, 21-cr-243-APM, entered through a broken window and remained in the building for about 45 minutes, a much longer period of time than Williams. While inside, Lolos also took photos and chanted in front of law enforcement officers. Unlike Williams, he has a history of violence, including a conviction of criminal harassment for loudly threatening to kill a woman insider her office and making repeated punching motions at her face. Lolos, however, did not post about his experience on January 6 to social media. The Court sentenced Lolos to 14 days incarceration, and he was credited with time served.

d.  Stephanie Miller, 21-cr-266-TSC, entered the Capitol building through a window and remained in the building for approximately 10 minutes. She expressed pride, rather than remorse, after the riot, telling a friend over text that if she was charged she'll "proudly take" the charges. The Court sentenced Miller to 14 days incarceration.

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed

to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    **Combining Incarceration and Probation**

The sentence requested by the government—14 days of incarceration followed by three years' probation—is a lawful one. A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### a.    *A sentence imposed for a petty offense may include both incarceration and probation.*

#### i.    Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§ 211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal

sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[11] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[12] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different

---

[11] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

[12] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

    ii.  <u>Analysis</u>

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of

supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the

defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided

sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons. First, Section 3551(a) notes that the sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). When Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 23 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a

conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Ibid.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 23, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period

of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, Williams pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

> **b.   *A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.***

> i.   Relevant Background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[13]

ii. <u>Analysis</u>

A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[14]  Such a sentence would be appropriate for Williams here.

---

[13] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

[14] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Vic Williams to 14 days' incarceration, three years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:    _____
LAURA E. HILL
NV Bar No. 13894
Trial Attorney, Detailee
175 N Street, NE, 9th Floor
Washington, D.C. 20002
202-598-3962
Laura.E.Hill@usdoj.gov

31