**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
1

2    _____

3    United States of America,      ) Criminal Action
                                     ) No. 1:21-cr-00388-RC-1
4                      Plaintiff,    )
                                     ) Sentencing (via Zoom)
5    vs.                             )
                                     )
6    Vic Williams,                   ) Washington, D.C.
                                     ) February 7, 2022
7                      Defendant.    ) Time:  2:00 p.m.
     _____
8
```

**Transcript of Sentencing** (via Zoom)
**Held Before**
**The Honorable Rudolph Contreras** (via Zoom)
**United States District Judge**

A P P E A R A N C E S

```
11

12

13   For the Government:     Laura E. Hill
     (via Zoom)              DEPARTMENT OF JUSTICE
14                           175 N Street, NE Room 9.1811
                             Washington, D.C. 20002

15   For the Defendant:      Chip Lewis
     (via Zoom)              CHIP B. LEWIS LLC
16                           1207 South Shepherd Drive
                             Houston, Texas 77019
17

18   Also Present (via Zoom):
                             Aidee Gavito, U.S. Probation Officer
19   _____

20   Stenographic Official Court Reporter:
     (via Zoom)              Nancy J. Meyer
21                           Registered Diplomate Reporter
                             Certified Realtime Reporter
22                           333 Constitution Avenue, Northwest
                             Washington, D.C. 20001
23                           202-354-3118

24

25
```

1                P R O C E E D I N G S

2              (REPORTER'S NOTE:  This hearing was held during the
   COVID-19 pandemic restrictions and is subject to the
3  limitations of technology associated with the use of
   technology, including but not limited to telephone and video
4  signal interference, static, signal interruptions, and other
   restrictions and limitations associated with remote court
5  reporting via telephone, speakerphone, and/or
   videoconferencing.)

6

7              THE COURTROOM DEPUTY:  Judge, this is Criminal Action

8  21-388, United States v. Vic Williams.

9              For the United States, I have Laura E. Hill.  For

10 Vic Williams, I have Chip Lewis.  The probation officer today

11 is Aidee Gavito for Crystal Lustig, and our court reporter

12 today, again, is Nancy Meyer.

13             All parties are present.

14             THE COURT:  Good afternoon, everybody.  Are we ready

15 to get started?

16             MS. HILL:  Good afternoon.

17             MR. LEWIS:  Yes, Your Honor.

18             THE COURT:  Okay.  So let's start with the colloquy

19 for the -- under the CARES Act for the videoconferencing.  The

20 Chief Judge in this district has authorized the use of

21 videoconferencing for sentencings because they cannot be

22 conducted in person without seriously jeopardizing public

23 health and safety.  We're prepared to proceed today by

24 videoconferencing if the defendant consents.

25             Do the parties believe that proceeding today via

1    videoconference rather than waiting until a hearing can be held

2    in person is in the interests of justice?  Mr. Lewis?

3              MR. LEWIS:  We do, Your Honor.

4              THE COURT:  Okay.  If you could just make a short

5    record as to why it makes sense to go forward today by video

6    rather than waiting until we can do it in person when -- who

7    knows when.

8              MR. LEWIS:  Your Honor, I would take that entreaty

9    as -- as to who knows when as a very good reason.  Mr. Williams

10   is very eager to move forward with his life and put this very

11   poor decision behind him.

12             THE COURT:  All right.  Does -- Ms. Hill, do you have

13   a contrary view of things?

14             MS. HILL:  No, Your Honor.  We agree with the

15   defendant.

16             THE COURT:  All right.  And, Mr. Williams, I gather

17   that you're comfortable with the videoconferencing equipment

18   made available to you?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  And after having consulted with your

21   counsel, you agree to participate in today's sentencing hearing

22   using videoconferencing rather than being physically present in

23   the courtroom?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  All right.  The Court finds that the use

1    of the VTC is necessary because it is not practical to appear

2    in person.  Proceeding by VTC today is justified because the

3    interests of justice will be harmed without a prompt hearing.

4    And the defendant, after consultation with counsel, has

5    consented to proceeding in this fashion.

6          I normally ask a question as well about whether the

7    parties can talk in private, if necessary, but I'll state for

8    the record that from what I see on the videoconferencing,

9    counsel and defendant are sitting right next to each other so

10   they can clearly discuss something in private, if necessary.

11         All right.  All right.  Mr. Williams and defense

12   counsel, have you reviewed the presentence report as revised

13   following the defense and the government's submissions?

14              MR. LEWIS:  We have, Your Honor.

15              THE COURT:  Any additional objections?

16              MR. LEWIS:  None, Your Honor.

17              THE COURT:  All right.  Under Federal Rule of

18   Criminal Procedure 32(i)(3)(A), the Court will accept the

19   presentence report as its findings of fact on issues not in

20   dispute.

21         Defendant has pleaded guilty to a Class B misdemeanor to

22   which the sentencing guidelines do not apply.  Therefore, I

23   will assess and determine the proper sentence in this case by

24   reference to and in consideration of all the relevant factors

25   pursuant to the sentencing statute found at 18 U.S.C. 3553(a).

1    Defendant has pled guilty to Count 4, parading,

2    demonstrating, or picketing, in a Capitol Building, in

3    violation of 40 U.S.C. § 5104(e)(2)(G).  Defendant has no

4    criminal history.  The maximum term of imprisonment for this

5    offense is six months, and the maximum fine is $5,000.

6    Would the government like to address the Court regarding

7    sentencing, Ms. Hill?

8    MS. HILL:  Yes, Your Honor.

9    The events of January 6th are -- are unprecedented.  A

10   mob attacked the Capitol, causing a delay in the certification

11   of the Electoral College votes; countless injuries, including

12   to law enforcement officers; and about $1.5 million in property

13   damage.

14   This broader context of January 6th is important.  The

15   riot would not have been successful without its numbers, but I

16   will focus today on Mr. Williams' actions on January 6th and

17   the reason the government is requesting a sentence of 14 days

18   of incarceration, followed by 3 years of probation, 60 hours of

19   community service, and $500 in restitution.

20   On January 3rd, leading up to his trip to

21   Washington, D.C., Mr. Williams posted to Facebook, quote, don't

22   be fooled that you are not at war and take lightly just what is

23   at stake.  I am going to D.C. tomorrow to voice my concern.  If

24   we do not win this battle, we may need more than our voice to

25   keep our freedom, close quote.  By posting "we may need more

1    than our voice," Williams acknowledged that violence may be

2    needed and that he may participate in that violence.  Also, he

3    posted this message on a public forum; so he's sharing his view

4    that violence may be needed with others on social media.

5            On January 4th, Williams flew to Washington, D.C., where

6    he met up with a friend.  And on January 5th, Williams appeared

7    to have gone to an event with a crowd of President Trump

8    supporters.  After attending the event, Williams posted to

9    Facebook about a part of the crowd that, quote, looks like they

10   just rappelled from a helicopter.  Williams said of this group,

11   they are pissed and now they realize our freedom is being

12   attacked, and they're ready to fight as they were trained by

13   the same government now trying to steal their freedom.  He

14   further states they did not come for violence, but if pushed,

15   violence will ensue and the violence will take it by force.

16           On January 6th, Williams attended President Trump's

17   "Stop the Steal" rally.  He then walked to the Capitol with his

18   friend.  While he was en route to the Capitol, his friend

19   received a video showing smoke and violence at the Capitol.  In

20   the video posted to Facebook, Williams described what he saw in

21   the video as, quote, smoke flying everywhere.  They were

22   fighting them.  They were putting smoke on them.  Everything.

23   Trying to get them out of there, close quote.

24           Instead of deterring Williams, he marched forward to the

25   grounds.  To get to the building itself, Williams was required

1    to climb a wall and scaffolding, and then he entered the

2    building through the Senate wing door and remained inside for

3    about a minute and a half.

4         After the riot on January 6th -- so the evening of

5    January 6th -- and on January 7th, Williams posted to Facebook

6    that he was intending to return to the Capitol on January 7th,

7    the day after the Capitol riot.  He posted, "See you patriots

8    tomorrow at the Capitol" and "Go stand at the Capitol and be

9    counted."  So not only was he intending to return to the

10   Capitol, but he was encouraging others on social media to

11   attend as well.

12        About a month after that, in February of 2021, Williams

13   was interviewed by the FBI.  During that interview, he lied to

14   the FBI.  He unequivocally stated that he did not enter the

15   Capitol Building.  Williams also appears to have deleted

16   several social media posts about his participation in the

17   events on January 6th.  While I don't know the specifics of why

18   Mr. Williams deleted these posts, here's what I do know.

19        On January 17th, Williams told a third party that his

20   friend received a visit from the FBI.  He told that third

21   party, quote, he says I'm next, close quote.  Meaning, he would

22   soon receive a visit from the FBI himself.  On March 25th, the

23   FBI sent Facebook a preservation letter; on April 20th, a

24   search warrant.  Some of the social media posts related to

25   January 6th that the FBI received from tipsters were then not

1    recovered in the Facebook search warrant return.  That includes

2    the 17-minute Facebook live photo -- post -- excuse me -- a

3    photo from the Capitol with the caption, I said I wasn't going

4    in, but then I couldn't help myself, and a selfie in front of

5    the Capitol.

6            So in thinking of the nature and circumstances of the

7    offense, four aggravating factors affected the government's

8    sentencing recommendation.  First, that Williams saw smoke and

9    violence, yet he continued moving forward toward the Capitol

10   and, ultimately, joined the mob that entered the Capitol

11   Building.

12           Second, his social media posts.  He posted on

13   January 3rd and 5th about potential violence on January 6th.

14   He posted on January 6th about his actions on the 6th, and then

15   on the 6th and 7th, he talked about returning to the Capitol on

16   the 7th.

17           Third, that Williams lied to the FBI.  He told the FBI

18   that he was not in the building on January 6th, but he,

19   clearly, was.

20           Fourth, that he seemingly deleted Facebook posts

21   discussing his involvement in the Capitol riot.

22           While Williams has no criminal history, he's also shown

23   little remorse for his actions on January 6th.  Williams

24   alleges in his sentencing memorandum that he was caught up in

25   the moment and now regrets his decision.  But his actions here

1    speak louder than his words, and his actions contradict his

2    statement of remorse.  Williams' actions before and on

3    January 6th show that he acted deliberately.  He posted again

4    to social media on January 3rd about using more than his voice.

5    On January 5th, he talked about individuals being prepared for

6    violence.  On the 6th, before walking onto Capitol Grounds, he

7    saw smoke and violence at the Capitol.  He heard explosions,

8    yet he continued marching forward.  He climbed a wall, he

9    climbed scaffolding, ultimately, to enter the building.

10          And Williams' actions after the riot show his lack of

11   remorse.  He posted about returning to the Capitol on the 7th,

12   and he encouraged others to return with him.  And over a month

13   after the riot, he lied to the FBI about entering the Capitol.

14   Then he, seemingly, deleted Facebook posts.

15          So to ensure specific deterrence here, incarceration is

16   warranted.

17          The last thing I'd like to address is the need to avoid

18   unwarranted sentencing disparities.  In the defendant's

19   sentencing memorandum, they point to the case of Sean Cordon as

20   being similar to Mr. Williams' case, but there are major

21   distinctions with Williams' case and Cordon's case.  Cordon saw

22   violence before entering, but he was already on Capitol Grounds

23   when he saw that violence.  Also, there's no evidence that

24   Cordon posted anything to social media about January 6th,

25   unlike Mr. Williams.  Cordon did not talk about violence prior

1    to January 6th or advocate that anyone return to the Capitol

2    after January 6th.

3         Also, when interviewed by the FBI, Cordon told the

4    truth.  He immediately told the FBI that he had entered the

5    building.  And, finally, he was immediately remorseful about

6    his actions.  At the time of his arrest and, to my knowledge,

7    the first time he spoke with the FBI, Cordon told the FBI that

8    he knew what he did was wrong.  So all of that is contrary to

9    Mr. Williams' case.

10        Instead, the government would point the Court to the

11   cases that the government outlines in its sentencing

12   memorandum, and I'd be happy to answer questions about those.

13        But, in conclusion, Williams recognized the possibility

14   for violence on January 6th, and then he saw with his own eyes

15   smoke and violence on the 6th, yet he continued to move forward

16   to join the mob on Capitol Grounds.  After the riot, he

17   encouraged others to return with him the next day, and then he

18   explicitly lied to the FBI and, seemingly, deleted Facebook

19   posts related to January 6th.

20        And so for these reasons, the government recommends a

21   sentence of 14 days in custody, followed by 3 years of

22   probation, and 60 hours of community service.

23        Thank you.

24        THE COURT:  Thank you.

25        Mr. Lewis.

1        MR. LEWIS:  Thank you, Your Honor.

2        As His Honor is acutely aware, we have focused in our

3   papers on the measure of this man.  I chose to do so after

4   reviewing -- if not dozens -- hundreds of similar folks and the

5   outcomes of their cases.

6        Having learned about this Court and the very

7   hard-working nature of this Court, I have no doubt the Court

8   has looked at the contrast of cases, given this Court's track

9   record of making sure there are not disparate sentences with

10  similarly situated fact patterns and defendants.  Therefore, I

11  have slated the one case.

12       But most tellingly, Your Honor, in this regard, my

13  choice to focus on the measure of the man was an easy choice,

14  having gotten to know Mr. Williams.  As -- the Court may not be

15  familiar with this, but Ms. Hill and I entered along this

16  course early on about my desire to see Mr. Williams be

17  considered for a diverted sentence in this case, given his

18  remarkable background and what the government has conceded was

19  on the spectrum of the most benign facts of those charged with

20  similar offenses.  And I'll emphasize that.  The most benign

21  facts.

22       The Court knows what the spectrum of the hundreds of the

23  defendants in this case looks like, and I have no doubt the

24  Court recognizes where Mr. Williams falls on this spectrum.

25  Therefore, unless the Court asks me to further contrast the

1    circumstances factually of his conduct, I will choose to focus

2    on the man with my brief remaining remarks.

3         As a prosecutor and a defense lawyer going on close to

4    30 years, Your Honor, I have seen, heard, and done everything

5    possible in the name of the defense of our Constitution.  Both

6    as a prosecutor and a defense attorney, I have worked very,

7    very hard to make sure all those constitutional freedoms, all

8    the guarantees that our forefathers shed their blood for,

9    remain sacrosanct.

10        While I could probably not be further left on the

11   political spectrum -- in fact, I started a grassroots effort to

12   abolish the 22nd Amendment in favor of President Obama -- I

13   have come to know Vic Williams not for his political

14   viewpoints, I've come to know him as a man.  And I will tell

15   this Court, without hesitation, as I have defended and

16   prosecuted the most reprehensible of criminals throughout my

17   career, Vic Williams is the furthest thing from a criminal I've

18   ever seen.

19        His respect for the law, his loyalty, his dedication,

20   and service to not only his country, but those worldwide, as

21   the Court is aware from our sentencing memorandum, is

22   breathtakingly refreshing.

23        I do not have to agree with the politics of a man to

24   recognize the measure of that man.  And there's an old saying

25   that has stood the test of time, Your Honor, and it's because

1    it could be no more apropos, and that is through our deeds we

2    are known.  We're not talking about the deeds of January 4th

3    through 7th.  We're talking about almost 50 years on this

4    earth.

5         And I know the Court has studied our papers and has a

6    very good hold on the measure of this man, what he's done in

7    life, what he's overcome, and his dedication to the fellow man

8    and others.  It was remarkable when I read the letters.  Like

9    the Court, I've read thousands of letters of support, but

10   rarely have I ever encountered such a quality of letter in the

11   actual substantive comments these folks had to make about this

12   man and his life's work.

13        THE COURT:  If there's a silver lining here, it's

14   that he doesn't have to wait until he's in a casket to hear

15   those things about himself.

16        MR. LEWIS:  That is -- that is very true.  We often

17   don't get to hear those things about ourselves.  Unfortunately,

18   Mr. Williams' sole lack of good judgment that he's displayed

19   for 50 years has -- has led us to this point where you do hear

20   these things.  The last place he wanted to hear it, sitting in

21   front of an honorable jurist seated in the District of

22   Columbia.

23        As I have gained respect for Vic Williams as a man, I

24   also do not quarrel with his principles.  And while I invite

25   the Court to actually watch the entire narration that

1    Mr. Williams posted on his social media, I will highlight even

2    Ms. Hill's words.  And there were three words that were very

3    telling:  Voice your concerns.  It's voice your concerns,

4    narrate -- it's really what he was doing throughout the video.

5    If you watch it, Your Honor, he's narrating what he's seeing

6    and what's going on.  You can hear in his voice, you can see in

7    his eyes a sense of disbelief, a bit of awe.  I don't think

8    many of the folks like Vic Williams who went to D.C. as a

9    peaceful demonstrator could ever have imagined what was going

10   to unfold because of some very, very reprehensible folks who

11   had much different motives than Vic Williams.

12         And I've enjoined working with Ms. Hill.  She's a -- her

13   integrity, her honesty.  She's a very good lawyer, but we all

14   understand the DOJ's position here is one of an unfortunate

15   cookie-cutter mechanism.  It is very difficult -- and I am very

16   thankful that we have Your Honor to hear this -- in that the

17   cookie-cutter and mixing everybody into this crowd of

18   wrongdoers doesn't fit Vic Williams.

19         Vic has waited for this day to address His Honor.  And

20   without further ado, I'm going to close here and let him do so

21   because I think his words are much more important than mine.

22   He has --

23         THE COURT:  All right.  Let me ask you -- before you

24   turn it over --

25         MR. LEWIS:  Yes, Your Honor.

1      THE COURT:  -- just -- I want to focus in on two

2  issues, and one --

3      MR. LEWIS:  Yes, Your Honor.

4      THE COURT:  -- is the apparent deletion of the

5  electronic evidence, and two is the deception to the FBI during

6  that first interview.  Do you have anything to add on those

7  issues?

8      MR. LEWIS:  I will defer to Mr. Williams.  I would

9  add this, Your Honor:  Relative to the FBI, the exact quote

10  from discovery is that he said he went to the door and he

11  stopped short.  He will address that directly with Your Honor,

12  because that's what I asked him, quite frankly.  As -- as a

13  former prosecutor in making an argument such that Ms. Hill

14  made, I would have asked that very question.  Well, why didn't

15  you just tell the FBI from the jump?  And I will let him

16  address that.

17      As far as the deletion of his Facebook posts, I have

18  the -- I don't know if it's the pleasure, privilege, or what it

19  is, but I have a handful of other January 6th defendants.  And

20  in talking to all of them, I have seen a common thread.  And I

21  said the privilege or the good luck.  All of these folks are

22  charged with similar offenses.  There's no violence with any of

23  the defendants that chose to hire me.

24      However, I have seen a common thread that runs through

25  them of realizing very soon after the events, the despicable

1    events of January 6th, that there was -- and how do I say this

2    in PG terms?  There was one of those, oh, shucks moments.  This

3    is a lot bigger and a lot more serious than I thought it was.

4    And in that panic, without consulting counsel, without really

5    thinking it through, many folks decided it would be better not

6    to have any of their discussions about that event online.

7         I won't speak for Mr. Williams since he's right here and

8    he's very capable of addressing the Court, but I have seen that

9    run through the tenor of several of my own personal clients;

10   the decision that, uh-oh, I've participated in something that's

11   gotten way out of hand.  I don't want anything to do with it.

12   I'm going to get rid of any of the chats or my posts or my

13   comments.

14        And I will close as follows:  Over my almost

15   three decades immersed in the criminal justice system,

16   Your Honor, I've gotten to know a lot of people.  And as I said

17   a few minutes ago, I've represented -- I have defended some of

18   the most reprehensible criminals.  Vic Williams is about as far

19   from that as I have ever in my life encountered.  I've spent a

20   lot of time with him over the last several months.  I have met

21   family.  I have heard from a number of friends, coworkers, and

22   folks.

23        And as I see the Court, I know the Court has heard

24   plenty of these cases, has many more on its docket.  And while

25   I do not struggle with the Department of Justice's method of

1    prosecution here, it's an unprecedented behemoth of a task, but

2    this case and this man really cries for a unique set of

3    circumstances, not the broader context that the government

4    wants to paint some folks into, but the specific context of not

5    only his actions --

6         And one thing I would be remiss if I did not talk about

7    very quickly from a factual standpoint.  In that minute and few

8    seconds that Mr. Williams was actually in the Capitol taking a

9    photo, as he goes to leave, without any violence, without

10   incurring any violence, without seeing anything, there is a

11   lady who had gotten knocked down or fallen down.  He took the

12   time to help her up.  That's the measure of the man that he is.

13        This isn't a violent man who went to D.C. to further any

14   despicable agendas.  He went as a supporter of this country, of

15   the freedoms that we so covet and we so treasure, to see what

16   was going on.  And as -- as I referenced, the proof is in the

17   pudding.  If you listen to the video that Ms. Hill described,

18   he -- he sounds almost like a lay journalist narrating the

19   events, and the words he used are very important.  Voice my

20   concerns.  Stand and be counted.  Narrating the events.

21        Therefore, I'm going to defer to the Court.  We will

22   answer any questions.  I will let Mr. Williams answer the

23   direct questions His Honor has posed, but I respectfully

24   request this Court to fashion an appropriate sentence.  And I

25   would submit given this man and the 49 years of his conduct,

1      impeccable, that this Court can fashion a sentence somewhere

2      between time served and a very benign probation as I referenced

3      in our pleadings.

4          Mr. Williams does not at all struggle with the

5      court-ordered restitution.  He is by nature, as the Court

6      knows, a community servant.  So additional community service is

7      in his blood.  It's not something the Court has to order, but

8      he will gladly discharge anything this Court finds appropriate.

9          I thank the Court for the patience.  It has been an

10     absolute pleasure practicing in front of you, and I look

11     forward to the opportunity someday down the road when we get

12     on the other side of this to practicing in front of you in

13     person.

14         Thank you, Your Honor, and I will now turn to

15     Mr. Williams.

16             THE COURT:  Thank you.  Go ahead, Mr. Williams.

17             THE DEFENDANT:  If I can use my notes, Your Honor.

18     Should I answer the questions, first?

19             MR. LEWIS:  Please.

20             THE COURT:  If you could -- Mr. Williams, if you

21     could get a little closer to the microphone because it's a

22     little bit low.

23             THE DEFENDANT:  Is that better?

24             THE COURT:  That is better.  Thank you.

25             THE DEFENDANT:  Okay.  Yes.  Before I kind of go on

1    my notes, I'll answer -- the two questions, sir, the -- what

2    was the first one?  About the -- the videos.

3              MR. LEWIS:  The videos.  The deletion of the videos.

4              THE DEFENDANT:  Well, there's a couple different

5    stories to that.  One of them is my -- my wife, who just,

6    obviously, practiced her whole life more sense than me,

7    immediately on the 6th -- I think on the 6th, and maybe into

8    the 7th -- she was deleting them.  And, in fact, on my video

9    when you see me in the deal, you know, she's calling me.  "What

10   are you doing?  You know, are you at the Capitol?"

11             "I'm, you know, on the steps."  She's just -- and I

12   laugh.  And so she deleted some out of just -- she's seen

13   what's going on.  We're not seeing --

14             I know because I've seen the videos since of a lot of

15   crazy stuff that went on, but just the side I went in, we

16   didn't see the violence and, you know, the things that were

17   going on there.  So she deleted some of those.  Later, yes,

18   sir, exactly right, as Mr. Lewis said, just deleted them out of

19   oh my, you know.  Some of it was just talking by then.

20             But as far as the FBI, they came to my house, I think,

21   in February to pay me a visit.  My wife and I invited them in.

22   I'll just -- I have that part here.  We answered truthfully to

23   the questions they asked because they were there almost

24   two hours.  It was a very pleasant visit, honestly.  They were

25   very respectful.  We were respectful.  I -- I was honest as far

1    as telling them I had not heard of Oath Keepers, Proud Boys,

2    Q some -- a Q movement or group.  I had never heard of them in

3    my life until the 6th.

4         On the 6th, I did hear of them.  Actually, the 5th I

5    heard of one group, and on the 6th I heard of the other two.

6    One of them was just because -- at the Capitol there was a

7    bunch of green smoke, and I'd asked somebody next to me,

8    "What's the green smoke all about?"  And in a brief ten

9    minutes, they explained the Q thing.  I was -- all that part

10   was new to me.

11        But when they came back for the arrest -- I think that

12   was May 20th.  When they came back for the arrest, I was

13   asked -- oh, and I was asked -- I'm sorry.  Excuse me.  I was

14   asked if I entered the building when they visited in February.

15   And -- and, I mean, I was scared to death.  By the time I

16   answered all those questions, I thought, you know, do I deny

17   this one?  Do I not tell them?  Do I ask for an attorney?  Can

18   I -- what do I do?

19        I did not want to lie to the FBI, but I sure didn't want

20   to admit to going in the building.  I was scared to death.  And

21   so I only told them I went to the door.  I was misleading, of

22   course, a hundred percent.  I -- I was.  But I will say when

23   they came back -- they arrested me -- I apologized to

24   Agent Fields.  They were -- I know I've heard stories about

25   some of these arrests, but they were very, very courteous,

1    professional, and they were -- the whole time they were.  They

2    even allowed my wife to grab extra clothes for me to appear

3    before the judge.  And I apologized to them for lying to them.

4    I had -- there was a lady -- and I can't remember her name --

5    and there was Agent Fields.

6          And I told them everything.  They asked for my phone.  I

7    gave it to them immediately.  I told them where my videos were.

8                MR. LEWIS:  Passwords.

9                THE DEFENDANT:  Passwords on the phone.  Everything I

10   could, I gave to them.  And, I mean, in fact, at one point of

11   talking, they reminded me I had the right to an attorney, but I

12   had told them everything already except for -- the only thing I

13   had not been honest with them about was going into the

14   building.

15         And so on those two questions, that's where I am, sir.

16               MR. LEWIS:  Do you have anything else you want to

17   tell the Court?

18               THE DEFENDANT:  If I go on, is that all right?

19               MR. LEWIS:  Sure.

20               THE DEFENDANT:  Up until that point, you know, I've

21   always had a great deal of respect for authority.  I've never

22   condoned any kind of violence, any behavior.  To the contrary.

23   My daughters can attest to this.  They've had endless speeches

24   about respecting authority, from elementary school.

25         Like many others on the 6th, I was confused.  There was

1   curiosity.  There was a lot of emotions going on.  I had every

2   intention to go to a peaceful rally, hear what was going on,

3   even do some sightseeing with my friend at the nation's

4   capital, and then return home.  I didn't.  I swear I did not

5   have any prior intention to go to the Capitol Building to be a

6   part of any type of riot, violence, or anything else.

7        I've spent much of my life in service to people.  I've

8   worked hard my entire life.  I've always been active in church,

9   the community, along with communities around the different

10  parts of the world.  I've lived a very fulfilling life.  I

11  don't want this one careless act to overshadow decades of

12  service and work, and I do apologize for it.  If I could take

13  back the things at the Capitol that day, you know, I,

14  obviously, promise that I would, but that's not possible.  So

15  all I can do is apologize to the Court now.

16       Another person I talked to is -- I had just got a new

17  job at the time of the arrest, very -- the CEO is a NASA

18  engineer.  They were all very, very high up in NASA as

19  engineers, and they had invented some very new technology in

20  the field I work in, very sophisticated.  They hired me to come

21  on and help them.  When I got arrested on May 20th, on

22  May 21st -- because I was going to start June 1st -- I called

23  them all, had a meeting, and I told them the situation.  I

24  apologized.  I gave them the opportunity -- because some of

25  these had their own money involved in this to make this company

1    go forward.  And I gave them the opportunity to let me go, get

2    rid of me, not hire me.  I was just sick.  I didn't want to do

3    that to the company, knowing my name was going to be in this.

4         They kept me on.  I'm a hard worker and they knew that.

5    I -- they kept me on without health benefits.  They made me

6    contract.  But even then, they gave me enough that I could go

7    get my own insurance, take care of myself.  They just wanted to

8    keep me as a contract employee.  And I've always been very

9    appreciative of that -- of them for that.

10        I also appreciate the Court for allowing me to travel

11   for work because I've been able to travel freely.  Staying

12   employed, keeping my family afloat, you know, and doing what we

13   need to do, I appreciate it.

14        All I can do now is apologize to the Court, and I can

15   say that if I -- if I -- if an officer would have just snapped

16   at me, yelled at me, anything, told me to leave, I would have,

17   but that doesn't take the fact that common sense that's ruled

18   me my whole life should not have jumped in and used it to just

19   leave anyway, you know.  I went to the rally.  It was enough.

20        Unfortunately, like I keep saying, I can't take that

21   back.  I regret it.  I apologize to my wife and kids.  That was

22   another reason for taking some of the posts down.  My kids are

23   both professionals, have their degrees, very good jobs, and

24   they've had to suffer because of my actions.  Just, you know,

25   comments and that and some pressure from that.

1          I've apologized to the FBI agents.  Many of the TSA

2     agents, who -- they're already shorthanded, you know -- have to

3     be tied up when I fly.  The pretrial service employees I've

4     apologized to.  And, again, I apologize to the Court today for

5     all the hours they've had to spend on my case and dealing with

6     this.

7          Lastly, just in conclusion, my wife and I, we recently

8     moved to our final -- hopefully, our final house.  It's the

9     last home.  And I -- hopefully, it's our last home.  It's in a

10    small, quiet community.  We hope to be able to put it behind

11    us, retire one day, enjoy our grandchildren, teach them golf,

12    baseball, and continue the life of service that we've always

13    had.

14          Thank you, Your Honor.  I appreciate it.

15          THE COURT:  As I reviewed your background and all the

16    work you've done in Africa and elsewhere, literally the most

17    letters I've ever gotten from any -- maybe any defendant ever,

18    everyone is saying you're the greatest thing since sliced

19    bread.  The one piece of the puzzle that didn't make sense to

20    me is did I read that you're estranged from your mother?

21          THE DEFENDANT:  Yes, sir.  Yes.

22          THE COURT:  Yes?  That --

23          (Indiscernible simultaneous cross-talk.)

24          THE COURT:  You're just a little bit younger than me,

25    that -- you know, every year may be her last.  That may be

1    something you want to work on.

2              THE DEFENDANT:  Absolutely, Your Honor.

3              THE COURT:  All those people think you're great.

4    You've got to make an effort.

5              THE DEFENDANT:  Yes, sir.

6              THE COURT:  All right.  That has nothing to do with

7    this case, but I -- that was the one piece of the puzzle that

8    just jumped out at me.  I couldn't figure that one out.  So

9    good luck on that.  Those -- family's always complicated, but

10   you've got to make an effort as people get older.

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  All right.  So we'll start out with the

13   financial issues, which is the $500 for the restitution to be

14   paid to the Clerk to be forwarded to the Architect of the

15   Capitol.  That's -- everyone's in agreement on that.

16        The maximum fine is $5,000.  Although probation

17   indicated that he has an ability to pay, noting ownership of

18   several rental properties, I believe only a modest fine is in

19   order to help compensate the government for a portion of its

20   supervision of defendant for the past year and the upcoming

21   year.  So I'm going to impose a fine of $1500.

22        The Court is to impose a sentence sufficient but not

23   greater than necessary to comply with the purposes set forth in

24   the subsection, and I'm to consider the nature and

25   circumstances of the offense and the history and

1    characteristics of the defendant, impose a sentence that

2    reflects the seriousness of the offense, promotes respect for

3    the law, and provides just punishment for the offense.

4        Of course, the offense is serious.  A number of my

5    colleagues have spoken eloquently about this.  Defendant took

6    part in a mob riot that took place at the Capitol on

7    January 6th, 2021.  Many of the rioters engaged in violence and

8    some destroyed property.  I have watched numerous videos of

9    rioters engaging in hand-to-hand combat with police officials.

10   It was not a peaceful event.  More than a hundred law

11   enforcement officers were injured on that day; moreover, the

12   Capitol sustained almost $1.5 million in property damage.

13       Many of the rioters intended to block the certification

14   of the votes for President Joe Biden, and although the rioters

15   failed to block that certification, they delayed it for several

16   hours.  The security breach forced lawmakers to hide inside the

17   House gallery until they could be evacuated to undisclosed

18   locations.  In short, the rioters' actions threatened the

19   peaceful transfer of power, a direct attack on our nation's

20   democracy.

21       With that said, no evidence has been presented that

22   shows defendant assaulting law enforcement or destroying

23   property.  After entering the Capitol Building through an

24   entrance at which law enforcement had been overwhelmed a short

25   time beforehand, defendant entered the Capitol Building for

1   less than two minutes.  Although he entered the building

2   through an open door, he scaled the wall and scaffolding to

3   access a higher level of the grounds to get to that door.

4        The riot was successful in delaying the certification,

5   in large part, because of the larger number of participants,

6   which simply overwhelmed the outnumbered law enforcement

7   officers present.  Regardless of his intentions, because

8   defendant contributed to these numbers, he must be held

9   accountable for his actions and the results to which his

10  actions contributed.

11       The defendant also appears to have deleted some

12  electronic evidence on his social media accounts and, most

13  concerning, lied to the FBI during his first interview.  But to

14  his credit, he pleaded guilty at an early juncture and

15  cooperated with the investigation in other respects.

16       Otherwise, defendant has no criminal history.  He's a

17  49-year-old man with a college degree.  He served in the

18  United States Navy Reserves for several months before a severe

19  injury resulted in a medical discharge.  He appears to have

20  been gainfully employed for the majority of his adult life,

21  earning a good salary for several years in the oil and gas

22  industry.

23       However, defendant's upbringing was not ideal.  His

24  parents divorced when he was about 7.  His father, who abused

25  drugs and alcohol during that time, did not play much of a role

1    in his life subsequently, either emotionally or financially.

2    His mother supported him on his -- on her modest wages.  When

3    she remarried to a man with which defendant did not bond, they

4    both regularly disciplined him using corporal punishment.

5         On the brighter side, Mr. Williams has been married for

6    27 years, has 2 adult daughters, 1 grandchild, and another one

7    on the way.  He, thus, appears to have a strong family support

8    system in place.

9         One thing that stands out about the defendant are his

10   charitable activities.  He founded a nonprofit organization

11   called the Green Foundation that has engaged in charitable work

12   in several countries, most notably building wells for fresh

13   water and subsidizing education in Kenya.  Mr. Williams

14   provides most of the funding for this endeavor.  He also owns a

15   craft coffee company with proceeds used to provide high-quality

16   coffee to members of the armed forces.  The Court received and

17   read an unusually large number of letters in support of the

18   defendant.

19        The Court is to impose a sentence that affords adequate

20   deterrence to criminal conduct, protects the public from

21   further crimes of the defendant.  The events of January 6th

22   involved a rather unprecedented confluence of events spurred by

23   then-President Trump and a number of his prominent allies who

24   bear much of the responsibility of what occurred on that day.

25        Since his arrest, defendant seems to have done well

1  while on release status.  The Court is confident that given his

2  prior lack of criminal history and a lack of violent past,

3  Mr. Williams is unlikely to reoffend.  He will not be

4  emotionally swept up in irrational actions and will not be a

5  risk to the public.

6      With respect to general deterrence, the Court does not

7  believe that incarceration is necessary to deter other

8  nonviolent protesters from crossing the line into lawbreaking.

9  The defendant's ordeal through the criminal justice system,

10  fines, restitution, community service, and probation with some

11  level of confinement, should serve as an adequate deterrent to

12  those who can be deterred.

13      The Court is to provide the defendant with needed

14  educational or vocational training, medical care, or other

15  correctional treatment in the most effective manner.  Nothing

16  has been brought to my attention in this respect.

17      The Court is to consider the kinds of sentences

18  available.  Given the nature of the crime and the defendant's

19  lack of criminal history, the Court is considering a period of

20  probation that contains restrictions and imposes home

21  confinement for a short period of time with some leeway given

22  for the out-of-town travel that his job sometimes requires.

23  Even if the Court were inclined to consider a short term of

24  incarceration, it would not be prudent to impose one given the

25  COVID pandemic.

1      The Court is to impose a sentence that takes into

2 consideration the kinds of sentence and the sentencing range

3 established for the applicable category of offense committed by

4 the applicable category of defendant as set forth in the

5 guidelines, but the Court is cognizant that the guidelines

6 don't apply here.  And no pertinent policy statements issued by

7 the Sentencing Commission have been brought to my attention.

8      The Court is to impose a sentence that avoids

9 unwarranted sentence disparities among defendants with similar

10 records who have been found guilty of similar conduct.  The

11 problem with this case is that there are a number of judges

12 deciding literally hundreds of cases.  So one could probably

13 point to any single case to support their argument.  But the

14 government has provided a chart that lists a number of

15 January 6th defendant sentencings.  There's not enough granular

16 information in that chart to make apt comparisons.  However,

17 the list does make it clear that the government has recommended

18 noncustodial home confinement probation sentences in a number

19 of these cases.  And the Court finds it hard to distinguish

20 this case from those.

21      We already dealt with the restitution of $500 for the

22 Architect of the Capitol.

23      I will now indicate the sentence to be imposed, but

24 counsel will have one opportunity to make any legal objection

25 before the sentence is actually imposed.

1          Mr. Lewis, do you have any objections to any of the

2    factors I'm considering?

3          MR. LEWIS:  None, Your Honor.

4          THE COURT:  Ms. Hill?

5          MS. HILL:  No, none, Your Honor.

6          THE COURT:  It is the judgment of the Court that you,

7    Vic Williams, are hereby sentenced to serve a 12-month term of

8    probation on Count 4.  This term of probation shall include a

9    2-month term of home confinement, location monitoring with

10   flexibility to allow out-of-town work travel with preapproval

11   from the probation office.

12         You're further ordered to pay a special assessment of

13   $10, as per statute, and a fine of $1500 as to Count 4.  You

14   are ordered to make the restitution to the Architect of the

15   Capitol in the amount of $500.  And these financial obligations

16   in the aggregate are to be paid at a rate of $170 per month.

17   The special assessment and fine are payable to the Clerk of the

18   Court.  Within 30 days of any change of address, you shall

19   notify the Clerk of the Court of the change until such time as

20   financial obligations are paid in full.

21         While on supervision, you shall not use or possess an

22   illegal controlled substance; and you shall not commit another

23   federal, state, or local crime.  The mandatory drug testing

24   condition is suspended based on the Court's determination that

25   you pose a low risk of future substance abuse.

1          You shall also abide by the general conditions of

2   supervision adopted by the U.S. Probation Office, which will be

3   set forth in the judgment and commitment order, as well as the

4   following special conditions:  As I indicated, the location

5   monitoring to monitor the home confinement, which will either

6   be radiofrequency or GPS, depending on what the probation

7   office there uses, and will last for the amount -- the period

8   of time for the home confinement.

9          There's also, because of the financial requirements, a

10  financial information disclosure requirement that you need to

11  provide probation with financial information; but if you pay

12  everything up-front, that may be unnecessary.

13         And then community service.  You must complete 60 hours

14  of community service within 6 months, which, as Mr. Lewis

15  indicated, is in your nature anyway.

16         Counsel, any reason other than those previously stated

17  and argued why the sentence should not be imposed as just

18  stated?

19              MR. LEWIS:  None, Your Honor.

20              MS. HILL:  No, Your Honor.

21              THE COURT:  The sentence is as stated.

22         I gather, Ms. Hill, that there's a -- he pleaded to

23  Count 4 of the information.  So Counts 1, 2, and 3 need to be

24  dismissed; is that right?

25              MS. HILL:  Yes, Your Honor.  I so move.

1        THE COURT REPORTER:  Sorry, Judge.  We couldn't hear

2    your last sentence.

3        THE COURT:  I'll go ahead and dismiss those:  Counts

4    1, 2, and 3.

5        All right.  Mr. Williams, you were convicted by a plea

6    of guilty.  You can appeal your conviction if you believe that

7    your guilty plea was somehow involuntary or if there's some

8    other fundamental defect in the proceedings that was not waived

9    by your guilty plea, although I note that your guilty plea did

10   have a pretty substantial waiver of appellate rights and

11   collateral attack rights.  But if you're inclined to appeal,

12   discuss it with your very able counsel.

13       You may also have a statutory right to appeal under

14   certain circumstances, and you can consult with your counsel

15   about those as well.  If you decide to appeal, you have the

16   right to apply for leave to appeal in forma pauperis.  That

17   means without the payment of costs.  And if you request and

18   qualify, the Clerk of the Court will prepare and file a notice

19   of appeal on your behalf, although I note that you're

20   represented by very able counsel who can assist you in that

21   process.

22       But, most importantly, with very few exceptions, any

23   notice of appeal must be filed within 14 days of the entry of

24   the judgment.  It's going to take a couple days to get that

25   judgment entered on the docket, and then it's 14 days after

1    that.

2            Probation has asked me that I transfer jurisdiction of

3    the supervision to the Eastern District of Arkansas.  Does --

4    Mr. Lewis, do you have any objection to that?

5            MR. LEWIS:  None whatsoever, Your Honor.

6            THE COURT:  Okay.  Ms. Hill?

7            MS. HILL:  No objection, Your Honor.

8            THE COURT:  Okay.  As soon as probation gives me the

9    paperwork for that transfer, I'll go ahead and enter that on

10   the docket as well.

11           Anything else we need to cover today, Mr. Lewis?

12           MR. LEWIS:  No, Your Honor.

13           THE COURT:  Ms. Hill?

14           MS. HILL:  Not from the government, Your Honor.

15           THE COURT:  All right.  Mr. Williams, good luck to

16   you, sir.  I hope you continue the good works you've done in

17   the past and that this is just a blip in an otherwise

18   commendable life.

19           THE DEFENDANT:  I appreciate it, Your Honor.

20           THE COURT:  All right.  Good luck.  You're excused.

21           (Proceedings were concluded at 2:48 p.m.)

22

23

24

25

1          <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                    Dated this 3rd day of April, 2022.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25